UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| IN RE CERTIFICATION FORM § | |
| FOR U VISA FOR MOVANT § | MISCELLANEOUS ACTION NO. |
| SAIDA LIZETH NUNEZ-RAMIREZ § | M-13-746 |
| § | |
| § | |

**REPORT AND RECOMMENDATION**

Movant Saida Lizeth Nunez-Ramirez ("Movant" or "Ms. Nunez"), represented by immigration counsel, has submitted a letter requesting that the District Court provide a certification in support of her U visa application pursuant to 8 U.S.C. § 1101(a)(15)(U). Specifically, Movant requests that the Court certify that she was "helpful" in the prosecution of criminal activity in *United States v. Julio Enrique Santos*, 7:09-cr-1358, a case that was closed about three years before Movant submitted her request for a U visa certification. Movant was one of three material witnesses held in custody at the Government's request in connection with criminal charges brought against Defendant Julio Enrique Santos for harboring undocumented aliens (including Movant and numerous others). (*See* Docket Nos. 1, 3, 12.)[1] Movant notes that the certification is only one of the requirements for a U visa and that the Court would not be making a final immigration determination. The District Court has referred this matter to the undersigned.

After carefully considering Movant's certification request in light of the record in *United States v. Santos*, 7:09-cr-1358, the undersigned concludes that the District Court should decline

---

[1] Unless otherwise noted, docket entry numbers refer to *United States v. Julio Enrique Santos*, 7:09-cr-1358.

to exercise its discretion to provide the requested U visa certification. As discussed further below, it is far from clear that Movant satisfies two key certification requirements: 1) that she was the victim of qualified criminal activity; and 2) that she was helpful in the investigation or prosecution of qualified criminal activity. Because the record is insufficient for the Court to render a U visa certification, the undersigned recommends that the District Court decline Movant's request without prejudice to her ability to seek such a certification from an appropriate investigating or prosecuting official.[2]

## I. BACKGROUND[3]

On August 26, 2009, a federal alien smuggling task force received information from a concerned citizen that a residence in Palmview, Texas, was being used to house undocumented aliens. Federal agents and local police officers approached the residence a few days later and encountered Defendant Julio Enrique Santos and 24 other undocumented aliens, including Movant. The federal agents arrested Santos and filed a criminal complaint charging him with harboring illegal aliens. According to the sworn complaint, Santos was the caretaker of a stash house for aliens who had entered the United States illegally and were awaiting transportation to Houston, Texas. Although Santos denied any involvement in alien smuggling, he admitted that he was a member of the MS 13 gang. The task force officers found ledgers maintained by Santos. The ledgers bore the notation "MS 13" and listed the names of the 24 undocumented

---

[2] If Movant does seek such a certification, she should provide the proposed certifying official with a copy of this report together with the District Court's ruling.

[3] The background facts are taken principally from the criminal complaint (Docket No. 1) and the Presentence Investigation Report (Docket No. 29) in *United States v. Julio Enrique Santos*, 7:09-cr-1358.

aliens found with Santos, as well as 114 other aliens who had previously been staged at the residence.

Along with the criminal complaint, the Government filed an affidavit naming three of the 24 aliens as material witnesses. Movant was one of the material witnesses. According to the Government's summary in the criminal complaint, all three witnesses identified Santos as the caretaker of the house who would bring them food and instruct them not to make noise.

Movant stated that she made arrangements with an alien smuggler to be transported to Houston, Texas, for a fee of $2,400; she had paid $600 of the fee, with the remaining balance to be paid upon her arrival in Houston. (*See* Docket No. 29, ¶ 14.) Movant illegally entered the United States with the aid of the smuggler, and she was taken to the residence where she was later found by federal task force officers. When Movant and the others arrived at the stash house, Defendant Santos took down their names. Movant "stated that SANTOS would constantly tell the group of undocumented aliens to call their families and make them send money for their smuggling fees." (Docket No. 1.) Movant said that Santos told them that if they ever got caught, they were not to tell immigration officials about him; otherwise, he would send his MS 13 gang friends after them.

Movant and the other two material witnesses made an initial appearance in court, and all three were appointed attorneys. Based on their lack of immigration status and the absence of appropriate conditions of release, all three material witnesses were held without bond. (Docket No. 8.) Movant's appointed attorney filed a motion requesting that her testimony be taken by deposition so that she could be released from custody. (Docket No. 11.) Before the material witnesses were deposed, Defendant Santos pleaded guilty pursuant to a plea agreement with the Government. The same day that Santos pleaded guilty, November 3, 2009, the Government

moved for the release of the material witnesses, noting that their "continued presence is no longer requested." (Docket No. 19.) The Court immediately granted the motion, ordering that the Marshals release Movant and the other witnesses. (Docket No. 20.) The Marshals presumably released Movant to the custody of immigration authorities.[4]

After accepting Santos's guilty plea, the District Court directed the Probation Office to prepare a Presentence Report (PSR). The PSR reflects the recommendation that Santos's offense level be enhanced because he harbored over 100 undocumented aliens (including the 24 in Movant's group as well as prior groups who had previously come through the same stash house). The PSR did not recommend any sentencing enhancements based on Santos's treatment of the undocumented aliens.

On May 28, 2010, the District Court sentenced Santos to 25 months imprisonment, which was on the low end of the sentencing guidelines range as determined by the Court. On June 14, 2010, the Court signed the judgment in Santos's case. He did not appeal his conviction, which thus became final fourteen days later on June 28, 2010. *See* FED. R. APP. P. 4(b)(1)(A).

Almost three years later, on May 6, 2013, Movant's immigration counsel submitted the pending request that the District Court sign a form "I-918 Supplement B, U Nonimmigrant Status Certification."

## II. ANALYSIS

"Congress created the U nonimmigrant classification or U Visa in 2000 for victims of serious crimes and some of their family members." *Torres-Tristan v. Holder*, 656 F.3d 653, 656

---

[4] It is unclear whether Movant remained in the United States or whether she was removed and then later re-entered.

(7th Cir. 2011) (citing Pub. L. No. 106–386, 114 Stat. 1464 (2000); *Fonseca–Sanchez v. Gonzales*, 484 F.3d 439, 442 n.4 (7th Cir. 2007)). The U visa was created as part of the Battered Immigrant Women Protection Act of 2000 (BIWPA). *See* Pub. L. No. 106–386, 114 Stat. 1464 (2000). In regulations implementing the U visa provision, the Department of Homeland Security (DHS) explained:

> The purpose of the U nonimmigrant classification is to strengthen the ability of law enforcement agencies to investigate and prosecute such crimes as domestic violence, sexual assault, and trafficking in persons, while offering protection to alien crime victims in keeping with the humanitarian interests of the United States.
> . . . .
> Alien victims may not have legal status and, therefore may be reluctant to help in the investigation or prosecution of criminal activity for fear of removal from the United States. In passing this legislation, Congress intended to strengthen the ability of law enforcement agencies to investigate and prosecute cases of domestic violence, sexual assault, trafficking of aliens and other crimes while offering protection to victims of such crimes. *See* BIWPA, sec. 1513(a)(2)(A). Congress also sought to encourage law enforcement officials to better serve immigrant crime victims. *Id*.

Eligibility for "U" Nonimmigrant Status (Interim Rule), 72 Fed. Reg. 53014-15 (Sept. 17, 2007).

To qualify for U visa status, the Secretary of DHS must determine that an alien meets several statutory requirements:

> **(I)** the alien has suffered substantial physical or mental abuse as a result of having been a victim of criminal activity described in clause (iii)[8 U.S.C.A. § 1101(a)(15)(U)(iii)];
>
> **(II)** the alien . . . possesses information concerning criminal activity described in clause (iii);
>
> **(III)** the alien . . . *has been helpful, is being helpful, or is likely to be helpful* to a Federal, State, or local law enforcement official, to a Federal, State, or local prosecutor, *to a Federal or State judge*, to the Service, or to other Federal, State, or local authorities *investigating or prosecuting criminal* activity described in clause (iii); and

5

> **(IV)** the criminal activity described in clause (iii) violated the laws of the United States or occurred in the United States . . . .

8 U.S.C.A. § 1101(a)(15)(U)(i) (emphasis added).  The relevant "criminal activity" is defined as follows:

> **(iii)** the criminal activity referred to in this clause is that involving one or more of the following or any similar activity in violation of Federal, State, or local criminal law: rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; stalking; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; fraud in foreign labor contracting (as defined in section 1351 of Title 18); or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes[.]

8 U.S.C.A. § 1101(a)(15)(U)(iii).

An alien applying for a U visa must submit the following certification:

> The petition filed by an alien under section 1101(a)(15)(U)(i) of this title shall contain a *certification from a Federal*, State, or local law enforcement official, prosecutor, *judge*, or other Federal, State, or local authority *investigating criminal activity* described in section 1101(a)(15)(U)(iii) of this title. . . .  This certification shall state that the alien "has been helpful, is being helpful, or is likely to be helpful" in the investigation or prosecution of criminal activity described in section 1101(a)(15)(U)(iii) of this title.

8 U.S.C.A. § 1184(p)(1) (emphasis added).  The regulations further describe the contents of the required certification:

> The certification must state that: the person signing the certificate is the head of the certifying agency, or any person(s) in a supervisory role who has been specifically designated by the head of the certifying agency to issue U nonimmigrant status certifications on behalf of that agency, or is a Federal, State, or local judge; the agency is a Federal, State, or local law enforcement agency, or prosecutor, judge or other authority, that has responsibility for the detection, investigation, prosecution, conviction, or sentencing of qualifying criminal activity; the applicant has been a victim of qualifying criminal activity that the certifying official's agency is investigating or prosecuting; the petitioner possesses information concerning the qualifying criminal activity of which he or she has been a victim; the petitioner has been, is being, or is likely to be helpful to

6

an investigation or prosecution of that qualifying criminal activity; and the qualifying criminal activity violated U.S. law, or occurred in the United States, its territories, its possessions, Indian country, or at military installations abroad.

8 C.F.R. § 214.14(c)(2)(i).

As other courts have recognized, there is "dissonance" in the statute in that an alien may seek a U visa certification from a "Federal . . . judge . . . investigating criminal activity described" in § 1101(a)(15)(U)(iii). 8 U.S.C.A. § 1184(p)(1); *see Agaton v. Hospitality & Catering Servs.*, Inc., C.A. 11-1716, 2013 WL 1282454, at *3 (W.D. La. Mar. 28, 2013). Of course, federal judges do not investigate criminal activity. Indeed, given that federal judges must remain neutral and impartial in presiding over criminal cases, it is difficult to envision how an alien could ever be "helpful to a Federal . . . judge" as required by the statute. 8 U.S.C. § 1101(a)(15)(U)(i)(III). Presumably, the statute should be construed to mean that a judge may certify that an alien was "helpful" *to the Government* in its investigation or prosecution of qualified criminal activity. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (noting the well-established rule that a statute's plain meaning controls unless it leads to absurd results); *see also Harris v. Runnels*, 53 U.S. 79, 80 n.3 (1851) (the rule of strict statutory construction "does not exclude the application of common sense to the terms made use of in the act in order to avoid any absurdity, which the legislature ought not to be presumed to have intended").

In attempting to reconcile the language of the statute with the role of judges, the regulations explain:

> USCIS is defining the term ["investigation or prosecution"] to include the conviction and sentencing of the perpetrator because these extend from the prosecution. Moreover, such inclusion is necessary to give effect to section 214(p)(1) of the INA, 8 U.S.C. § 1184(p)(1), which permits judges to sign certifications on behalf of U nonimmigrant status applications. Judges neither investigate crimes nor prosecute perpetrators. Therefore, USCIS believes that the

7

term "investigation or prosecution" should be interpreted broadly as in the AG Guidelines.

72 Fed. Reg. 53014, 53020 (citations ommitted).

Whether or not this explanation adequately reconciles the language of the statute with the role of judges,[5] the regulations suggest that a federal judge's involvement in U visa certifications should be limited to circumstances in which the judge is (or has been) involved in the conviction or sentencing of a defendant who engaged in qualifying criminal activity.[6]  *See Agaton*, 2013

---

[5] The regulations do not explain how an alien could be said to be "helpful" to a judge in connection with the conviction or sentencing of a defendant.  *See* 8 U.S.C. § 1101(a)(15)(U)(i)(III).

[6] Otherwise, a federal judge would be making a non-binding certification outside the context of any actual case, which may raise a more fundamental issue.  "Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.'" *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007); *see also Whitmore v. Arkansas,* 495 U.S. 149, 154-55 (1990) ("Article III, of course, gives the federal courts jurisdiction over only 'cases and controversies' "); *City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983) ("It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy.").  In light of the constitutional requirement that there be a "justiciable 'controversy,'" it is well-settled that a federal court does not have the authority to render an "advisory opinion." *Massachusetts v. E.P.A.,* 549 U.S. at 516; *see also U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 446 (1993) (quoting *Preiser v. Newkirk,* 422 U.S. 395, 401 (1975)) ("The exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy, and 'a federal court [lacks] the power to render advisory opinions.'"); *Boston Firefighters Union Local 718 v. Boston Chapter NAACP, Inc.,* 468 U.S. 1206, 1210 (1984) ("But such a ruling now-rendered in the absence of a present case or controversy in this proceeding- would amount to no more than an advisory opinion. The federal courts are forbidden by Article III of the Constitution from giving advisory opinions.").  These principles call into question a federal judge's authority to issue a U visa certification, particularly where the judge is not presiding over a criminal prosecution involving qualifying criminal activity.  However, this issue need not be explored further here in light of the undersigned's recommendation that the District Court decline to issue a U visa certification.  *See  Skilling v. United States*, 130 S. Ct. 2896, 2929-30 (2010) (noting that federal courts have been instructed to avoid, where possible, constitutional difficulties in interpreting statutes) (citing *Boos v. Barry,* 485 U.S. 312, 330-31 (1988)).

WL 1282454, at *4 (holding that the regulations "do not allow certification by a federal judge when that judge has no responsibilities regarding any pending investigation or prosecution of the qualifying crime"); *but see Villegas v. Metro. Gov't of Nashville,* No. 3:09–219, 2012 WL 4329034, at *5 (M.D. Tenn. 2012) (granting a U visa certification in the context of a civil case based on the finding that the alien had information that would be helpful to a future investigation where the alien "made a prima facie showing that she was a victim of the qualifying potential criminal activity"); *Garcia v. Audubon Cmtys. Mgmt.,* Civil Action No. 08–1291, 2008 WL 1774584, at *2–4 (E.D. La. 2008) (same).

Assuming that a federal judge may issue a U visa certification in an appropriate case, this does not mean that the judge is required to do so. As the Fifth Circuit has emphasized, it is "abundantly clear" from the language of the statute that the decision whether to issue such a "certification is a discretionary one." *Ordonez Orosco v. Napolitano*, 598 F.3d 222, 226 (5th Cir. 2010).

Here, Movant requests that the District Court provide a U visa certification based on her status as a material witness in an alien smuggling case that became final over three years ago, *United States v. Julio Enrique Santos*, 7:09-cr-1358. Movant suggests that she was helpful in the prosecution of qualifying criminal activity; specifically, she claims that she was a victim of trafficking and false imprisonment. There are two main issues in considering Movant's certification request: 1) whether she can be considered the victim of qualified criminal activity; and 2) whether she was in fact helpful to the Government's investigation or prosecution of qualified criminal activity in the *Santos* case.

A.   QUALIFYING CRIMINAL ACTIVITY

Movant requests that the District Court certify that she was a victim of trafficking, false imprisonment, and conspiracy to commit those crimes, which are all included within the statutory definition of "criminal activity" for purposes of U visa certification.[7]  8 U.S.C.A. § 1101(a)(15)(U)(iii).  She indicates that these crimes were committed by Defendant Julio Enrique Santos in connection with events for which she was held as a material witness.  However, it is unclear from the record of the *Santos* case whether Movant was the victim of either trafficking or false imprisonment.

   1.   Trafficking

Movant appears to contend that the harboring aliens charge brought by the Government against Mr. Santos is equivalent to the crime of "trafficking" enumerated in the statute.  Mr. Santos was indicted on charges of conspiring to harbor and harboring undocumented aliens at a residence in Palmview, Texas, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), (v)(I). (Docket No. 12.)  In addition to harboring, § 1324(a)(1)(A) also addresses the related crimes of smuggling and transporting undocumented aliens.

The crimes of smuggling, transporting, and harboring undocumented aliens are not specifically listed as the type of "criminal activity" for which a U visa certification may be sought.  8 U.S.C.A. § 1101(a)(15)(U)(iii).  This omission is clearly not dispositive since the statute states that relevant "criminal activity" includes the listed crimes "or any similar activity in

---

[7] Attached to her letter motion, Movant provided a completed "U Nonimmigrant Status Certification" for signature by the District Court.  Movant marked the three above-named crimes as the "criminal acts" that form the basis for the U visa certification.

10

violation of Federal, State, or local criminal law." *Id*. Still, it seems unlikely that Congress intended that alien smuggling, transporting, or harboring—without more—would satisfy the requirements for U visa status.

To begin with, as DHS noted in promulgating regulations to implement the U visa statute: "The purpose of the U nonimmigrant classification is to strengthen the ability of law enforcement agencies to investigate and prosecute such crimes as domestic violence, sexual assault, and trafficking in persons, while offering protection to alien crime victims . . . ." 72 Fed. Reg. 53014. The U visa provision thus focuses on crimes that victimize undocumented aliens.

"Trafficking" clearly falls within the category of crimes in which undocumented aliens may often be victims; "trafficking" crimes proscribe peonage, slavery, involuntary servitude, forced labor, and sex trafficking. *See* Victims of Trafficking Protection Act, 18 U.S.C. § 1581 *et seq*. For example, federal law makes "sex trafficking of children" a crime where "means of force, threats of force, fraud, coercion . . . , or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(2).

In contrast, the crimes of alien smuggling, transport, and harboring do not necessarily—or typically—involve circumstances in which the undocumented alien may be considered a victim; to the contrary, in the vast majority of cases involving alien smuggling, transporting, or harboring, the undocumented aliens are voluntary participants in the crime by seeking the services of smugglers who will assist them in entering the United States illegally and traveling

beyond the border area to locations where they are less likely to be apprehended by immigration enforcement officers.[8]

In addition to the fact that alien smuggling crimes do not necessarily involve alien victims, Congress's failure to specify these particular crimes in the U visa statute is telling. Alien smuggling, transporting, and harboring are perhaps the most obvious types of crimes involving aliens yet Congress did not include them in its long list of specific crimes that are the type of "criminal activity" for which a U visa may be sought. While the statute covers "any similar activity" in addition to the enumerated crimes, it seems unlikely that Congress considered alien smuggling or harboring to be similar to the listed crimes involving alien victims.

In any event, the regulations make this a moot point. Recognizing that a co-participant in criminal activity should not be accorded "victim" status, the regulations state: "A person who is culpable for the qualifying criminal activity being investigated or prosecuted is excluded from being recognized as a victim of qualifying criminal activity." 8 C.F.R. § 214.14(a)(14)(iii). This rule excludes aliens, such as Movant, who have illegally entered the United States (with the help of smugglers) from being considered "victims" of alien smuggling. Because Movant agreed to pay a smuggler to assist her in entering the United States illegally and transporting her to Houston, Movant was not a "victim" of "qualifying criminal activity" to the extent Mr. Santos's

---

[8] Of course, there are cases in which alien smuggling is combined with other crimes that victimize the aliens, such as trafficking. For example, criminal cases have been filed in this Court involving young women who were smuggled in the United States illegally and then forced into involuntary servitude and prostitution. Similarly, there are cases in which aliens who have made arrangements to be smuggled into the United States become the victims of crimes such as sexual assault at the hands of their smugglers. But such cases involve crimes in addition to alien smuggling.

criminal activity consisted of harboring aliens. *See United States v. Biao*, No. 98cr2812-BTM, 2011 WL 607087, at *1 (S.D. Cal. Feb. 11, 2011) (refusing to certify U visa for applicants who "sought certification based on their appearance as witnesses in an alien-smuggling case" where they had "presumably agreed to be smuggled into the United States" and thus could not show that they "suffered direct and proximate harm as a result of" the criminal activity) (citing 8 C.F.R. § 214.14(a)).

Perhaps recognizing this, Movant suggests that Mr. Santos's criminal activity involved more that alien smuggling or harboring. Movant's letter motion states: "In August of 2009, Ms. Nunez Ramirez was *trafficked* into the United States by Defendant Julio Enrique Santos' family member who solicited her in her native country of Honduras." (Emphasis added.) But the information in this unsworn statement appears nowhere in the record of the *Santos* case. In fact, it is contrary to the information provided to the District Court in the PSR, which states: "Liceth Nunez stated that she made arrangements with an unknown person in Reynosa, Tamaulipas, Mexico, to be smuggled to Houston, Texas, for a fee of $2,400." (Docket No. 29, ¶ 14.) There is nothing in the record of the *Santos* case to support the assertion that Movant was "trafficked" into the United States.[9]

If there is information that supports Movant's characterization of what happened, it would be known by the investigating agents and/or the prosecutor, not the Court. The Court lacks a sufficient basis upon which to certify that Movant was the victim of trafficking.

---

[9] Moreover, although Movant's letter uses the term "trafficked," it does not explain how the conduct of Defendant Santos or his family amounted to trafficking, as opposed to alien smuggling.

13

### 2. False Imprisonment

Movant also claims that she was the victim of false imprisonment, which is likewise one of the types of "criminal activity" specified in the statute. 8 U.S.C.A. § 1101(a)(15)(U)(iii). In support of this, Movant's counsel states:

> After being brought into the United Stateees, Ms. Nunez Ramirez was held against her will in a stash house near Palmview, Texas by the Defendant. During this time, the Defendant threatened her and other victims with gang related violence due to his membership in MS-13. The Defendant expressed to Ms. Nunez Ramirez that she would be held until her family paid additional money for her safe release.

If true, this unsworn statement might support the proposition that Movant was the victim of false imprisonment (or perhaps extortion or kidnapping). As with Movant's trafficking allegation, however, this version of events is not entirely consistent with the record. According to the sworn complaint filed at the time of Mr. Santos's arrest, Movant told investigative agents the following (in part):

> According to NUNEZ, SANTOS would tell them not to get out of the residence and not to make any noise. NUNEZ also stated that SANTOS would constantly tell the group of undocumented aliens to call their families and make them send the money for their smuggling fees. NUNEZ also claims that SANTOS threatened them and told them that if they would ever get caught by immigration officials not to provide any information about him. SANTOS told the group that if they talked, he would send his MS 13 gang member friends after them.

(Docket No. 1.) Similarly, the PSR described Movant's statements as follows:

> Ms. Nunez indicated that the defendant instructed them not to leave the house or make any noise and was very vulgar. She stated that he was always drinking and would constantly tell them to call their families to send the money for their smuggling fees. Ms. Nunez claimed that the defendant threatened them and told them that if they were caught by immigration officials they were not to provide any information about him. If they did talk, he threatened to send his fellow "MS 13" gang members after them.

(Docket No. 29, ¶ 14.)

In contrast to the description in her letter motion, the statements attributed to Movant in the complaint and in the PSR suggest that Mr. Santos was demanding that the aliens in Movant's group pay their agreed-upon smuggling fee—not that he was holding them hostage based on some new demand.[10] Also, the contemporaneous statements reflected in the record suggest that Santos's threats were made in the context of telling the aliens not to identify him if they were later apprehended by law enforcement officers. Although Movant now requests the Court to certify that she was the victim of false imprisonment by Mr. Santos, there is no indication in the record that Movant wanted to leave the stash house or that she was being held there against her will.[11] Santos was never charged with any crime other than harboring aliens, and neither the Government nor the Probation Office suggested that his sentence should be enhanced based on

---

[10] Movant had paid part of the fee, and she had agreed to pay the rest of the amount upon arriving in Houston. In some cases filed in this Court, the facts show that aliens have been held hostage in stash houses. In those situations, the smuggler or stash house caretaker typically calls the aliens' families and demands that additional money be paid (above the original agreed-upon smuggling fee), threatening to kill or harm the aliens if their families do not comply. But this does not appear to have happened in the *Santos* case. The Government never alleged that Santos was holding the aliens hostage in this way. Santos's statements seem to have been interpreted as an attempt to motivate the aliens to pay the agreed-upon smuggling fee, rather than holding them hostage based on new demands.

[11] Aliens being harbored at stash houses are routinely told to remain quiet and stay out of sight so that their presence in the residence is not noticed by neighbors or others (who may find it suspicious and alert law enforcement authorities). Being staged at a stash house with someone like Santos was no doubt unpleasant (to say the least), and Movant understandably would have been anxious to continue her transportation northward. It is an unfortunate reality that those, like Movant, who seek to enter the United States illegally often face a difficult and dangerous journey (including crossing the Rio Grande River in tubes or makeshift rafts, walking long distances in difficult weather conditions, hiding in cramped—and often unsanitary—stash houses, and being transported in vehicles in unsafe conditions).

his mistreatment of Movant and the other aliens that he harbored. The PSR concluded that "[t]here are no identifiable victims of the offense."[12] (Docket No. 29, ¶ 17.)

While it is possible that Movant was the victim of false imprisonment, the Court lacks information from which to reach such a conclusion. Here again, that type of information would be in the possession of the prosecutor or investigating agents. *See Biao*, 2011 WL 607087, at *1 (refusing to certify U visa where "the Court lacks information to determine whether the remaining elements of 8 CFR § 214.14(c)(2)(i) are satisfied").

**B.      HELPFULNESS**

Movant also asks the District Court to certify that she "'has been helpful, is being helpful, or is likely to be helpful' in the investigation or prosecution of criminal activity." *See* 8 U.S.C.A. § 1184(p)(1). It is unclear whether Movant contends that her status as a material witness alone establishes her helpfulness or whether she is asserting that her level of cooperation shows that she was "helpful" for purposes of U visa certification.

**1.      Material Witness Status**

It is doubtful that an alien's status as a material witness is sufficient, standing alone, to establish their helpfulness. As described by the Fifth Circuit: "The government, in its campaign against the unlawful entry into the United States by foreign nationals, ha[s] deployed a practice of detaining certain aliens as material witnesses for the criminal prosecution of those persons charged with transporting them across the border." *Aguilar-Ayala v. Ruiz*, 973 F.2d 411, 412

---

[12] The PSR noted that Movant and the other aliens were held in a "three-bedroom residence," which "had running water and was not locked from the outside. It was sanitary, but messy." (Docket No. 29, ¶ 15.)

(5th Cir. 1992). In the McAllen Division alone, each year hundreds of undocumented aliens are held as material witnesses at the request of the Government.[13] These material witnesses have entered the United States illegally, and they are typically apprehended under one of the following scenarios: they are found traveling on foot while being led by a guide (either near the border during their initial illegal entry or farther inland as they are attempting to circumvent a Border Patrol checkpoint); they are found in a vehicle driven by a transporter (often involving some attempt to conceal their presence in the vehicle); or—as in Movant's case—they are found in a stash house along with a caretaker (as they are awaiting transportation farther North).

Almost always, the "witness has been detained solely at the insistence of *the government*." *Aguilar-Ayala*, 973 F.2d at 420 (emphasis in original). The detention of material witnesses is authorized by statute, which contemplates that they will be released once their testimony is secured by a deposition:

> If it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person in accordance with the provisions of section 3142 of this title. No material witness may be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and if further detention is not necessary to prevent a failure of justice. Release of a material witness may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure.

---

[13] Based on statistics obtained from the Clerk's office, during the past year (from October 2012 through September 2013) the Government named over 1,400 material witnesses in cases filed in the Southern District of Texas. Over 500 of those material witnesses were named in cases filed in the McAllen Division.

18 U.S.C. § 3144. Rule 15 provides that the court may, upon motion by a material witness, order that the testimony of the witness be taken by deposition, and the court may discharge the witness after the deposition has been taken. FED. R. CRIM. P. 15(a)(2).

Simply because an alien has been held as a material witness at the Government's request does not mean that the alien has been "helpful" in the investigation and prosecution of qualified criminal activity. Material witnesses are typically held against their will, and they may or may not cooperate fully in their initial statements to law enforcement or in their later deposition or trial testimony.

### 2. Movant's Helpfulness

Movant's letter describes her helpfulness as follows:

> Subsequent to a raid of the stash house, Ms. Nunez Ramirez assisted in the investigation and prosecution against the Defendant. She provided a statement to investigating Border Patrol agents and participated in the Defendant's trial as a material witness. The Defendant was ultimately convicted of "Conspiracy to harbor illegal aliens within the United States" and "Harboring illegal aliens with the United States" and sentenced to imprisonment and fines . . .

Once again, this statement is not entirely consistent with the record.

It is true that Movant answered questions asked by Border Patrol agents (as reflected by the sworn criminal complaint), and she was held as a material witness. However, her assertion that she "participated in the Defendant's trial as a material witness" is incorrect. There was no trial because Defendant Santos pleaded guilty pursuant to a plea agreement. (Docket No. 18.) Immediately after Defendant's re-arraignment, the Government moved to release Movant and the

other material witnesses for the reason that "their continued presence is no longer requested."[14] (Docket No. 19.)

Based on this record, the Court has no way of knowing whether Movant was indeed helpful. It may well be true that her initial statement contributed to the Defendant's decision to plead guilty to the alien harboring charges, but those charges do not constitute qualified "criminal activity" within the meaning of the U visa statute. 8 U.S.C.A. § 1101(a)(15)(U)(i)(IV), (iii); *see supra* Part II.A.1. In addition, as discussed above, Movant cannot be considered a "victim" in connection with those charges because she was culpable herself in making arrangements with an alien smuggler and entering the United States illegally. *See* 8 C.F.R. § 214.14(a)(14)(iii). The Court has no information—and there is nothing in the record to suggest—that Movant was helpful in connection with any other alleged crimes by the Defendant Santos, such as trafficking or false imprisonment.[15] As the court noted in *Biao*, "[t]he prosecutor, and not this Court, would possess information sufficient to make that determination." *Biao*, 2011 WL 607087, at *1.

In sum, the District Court should decline to exercise its discretion to certify that Movant was helpful within the meaning of the U visa provision.

---

[14] Although Movant's court-appointed attorney had filed a motion to record her testimony by deposition (so that she could be released prior to Defendant's trial), the deposition became unnecessary because Defendant Santos pleaded guilty. (Docket No. 11.)

[15] Movant has not suggested that she is "likely to be helpful" in any future investigation or prosecution, nor could she. There is no reason to believe that the Government would bring any additional charges against Defendant Santos arising out of these events. In moving to release Movant and the other material witnesses after Defendant Santos's guilty plea, the Government noted that "their continued presence is no longer requested." (Docket No. 19.)

## III.  CONCLUSION

For the foregoing reasons, it is respectfully recommended that the District Court decline to exercise its discretion to sign Plaintiff's proposed "U Nonimmigrant Status Certification, I-918 Supplement B."

## NOTICE TO THE PARTIES

The Clerk shall send copies of this Report and Recommendation to counsel for Movant and counsel for the Government (in *United States v. Julio Enrique Santos*, 7:09-cr-1358), who have fourteen (14) days after receipt thereof to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b).  Failure to file timely written objections shall bar an aggrieved party from receiving a *de novo* review by the District Court on an issue covered in this Report and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

DONE at McAllen, Texas on December 3, 2013.

_____
Peter E. Ormsby
United States Magistrate Judge